IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROEL OLIVARES,<br><br>      Plaintiff,<br><br>  v.<br><br>CANTEEN VENDING SERVICE;<br>COMPASS GROUP USA, INC.; and<br>DOES 1 to 50,<br><br>      Defendants. | CIV-S-04-0262 DFL-PAN<br><br>MEMORANDUM OF OPINION<br>AND ORDER |

    Plaintiff Roel Olivares ("Olivares") was fired by his employer, defendants Canteen Vending Service ("Canteen") and Compass Group USA ("Compass"), for allegedly stealing money. Olivares asserts that he was fired because of his age. He brings claims for: (1) age discrimination in violation of the California Fair Employment and Housing Act ("FEHA"); (2) tortious termination in violation of public policy; and (3) breach of the covenant of good faith and fair dealing. Canteen and Compass move for summary judgment on all of Olivares's claims. For the following reasons, the court GRANTS defendants' motion.

I.

Canteen, a division of Compass, operates a large vending machine business.[1] (Mot. at 2.) Olivares, who was 57 during the relevant time period, was employed by Canteen as a relief driver from 1970 until his termination in 2003. (Opp'n to Defs.' SUF ¶ 1; Opp'n at 7.) According to Olivares, his employment was subject to a collective bargaining agreement under which he could not be fired "without just cause." (Pl.'s Ex. 1 at 15.) Canteen's employment policies provided that employees can be "immediately terminated (and possibly prosecuted) for, among other things, . . . taking money from the cash register, money bags or petty cash fund." (Carp. Decl. Ex. A at Doc. 21.) Wendell Nall was Olivares's manager. (Nall Decl. ¶¶ 2, 4.)

As a relief driver, Olivares filled in for regular route drivers as needed, servicing the vending machines on their routes. The servicing of a vending machine involves the following steps: (1) the driver replenishes the product stock, removes the dollar bills and change from the collection portion of the machine, and places the collected bills and coins in a "collections bag;" (2) he then checks the machine's "coin mechanism" to make sure there are adequate coins to make change; (3) if the coin mechanism is low or empty, the driver refills the coin mechanism with a roll of coins from his "change bank" or "nickel fund;" and (4) if the driver has to replenish the coin

---

[1] For the sake of simplicity, the court refers to both defendants as "Canteen" in this order.

2

mechanism, he takes bills from his collections bag to replenish his change bank.  (Pl.'s Ex. 10 at 21-23.)

During a four-week period in May and June 2003, Olivares was the sole driver responsible for Route 44.[2]  (Nall Decl. ¶ 5; Pl.'s Ex. 12 at 18.)  During this period, Route 44 was "short" more than $1,000, or 6.3 percent.  (Pl.'s Ex. 3.)  Although Canteen's records show that drivers were often "over" or "short" for their routes, a 6.3 percent shortage on Route 44 was an unusually high shortage rate.[3]  (Id.)

Olivares had been reprimanded on prior occasions about the shortage rate on his routes.  He received two counseling reports, in 1995 and 1996, in which he was reprimanded for shortages on the machines he was servicing.  (Cohen Decl. Ex. A at 76-77, 79-80, exs. 7, 10).  Additionally, in 2001, a letter addressed to him and four other drivers was posted in the company's office, warning the drivers that their route accounting far exceeded the company's policy on shortages (.05 %).  (Pl.'s Ex. 7.)

The high shortage rate on Route 44 during this four-week period caught the attention of John Williamson, a customer service manager for Canteen.  (Pl.'s Ex. 12 at 18.)  Suspecting

---

[2] Olivares disputes this fact.  He claims that he was responsible for a different route during these four weeks.  (Opp'n to Defs.' SUF ¶ 16.)  However, the evidence presented by Olivares does not contradict or call into question this fact; at most, it suggests that Olivares was working more than one route during this time period.  (Pl.'s Ex. 3.)

[3] For example, the next highest shortage rate for that period was 3.58 percent.  (Id.)

3

theft, Williamson and another customer service manager, John Coates, requested and received authorization from Nall to audit the four machines on Olivares's route before he arrived to service them on June 4, 2003. (Nall Decl. ¶ 6.) As part of the audit, Williamson and Coates ensured that the coin mechanisms were full so that Olivares would have no need to take coins from his nickel fund.[4] (Williamson Decl. ¶ 2.)

After Olivares serviced the machines later that day, Williamson and Coates compared their figures to the amount Olivares turned in.[5] (Id.) Based on this comparison, Williamson and Coates concluded that Olivares was forty dollars short in bills. (Id.; Id. Exs. A-E.). Williamson and Coates informed Nall of the results of their investigation. (Nall Decl. ¶ 7.) Williamson specifically told Nall that he made sure the coin mechanisms on the machines were full. (Williamson Decl. ¶ 4.)

On receiving this information, Nall called Olivares into his office on June 6, 2003 and confronted Olivares with the evidence from the investigation. (Pl.'s Ex. 10 at 40.) Olivares offered

---

[4] Olivares claims that this is a disputed fact. (Opp'n to Defs.' SUF ¶ 21.) However, Olivares has submitted no evidence that directly contradicts Williamson's declaration. Rather, he only points to his deposition testimony in which he denies stealing the money and generally describes the process by which he would top off the coin mechanism and replace the coins with bills collected from the machine. (Pl.'s Ex. 10 at 21-26.) This does not create a genuine factual dispute.

[5] Williamson and Coates did not actually count the money Olivares turned in, nor did they watch while the money was counted. (Pl.'s Ex. 11 at 23-26.) Rather, the money was counted by Canteen's vault clerk. (Id.)

4

no explanation in response to these allegations. (Id. at 45.) Accordingly, Nall informed Olivares he was being terminated for suspected theft. (Nall Decl. ¶ 8.)

After Olivares's termination, Canteen was required to, and did, put the position out to bid with the Teamsters Union. (Id. ¶ 8.) Canteen was required to accept the highest bidder. (Id. ¶ 9.) Only after none of the existing employees bid for the position was a replacement hired from outside the company. (Id.) Olivares's position was eventually taken over by an individual under the age of 40. (Pl.'s Ex. 12 at 27-28.)

## II.

A. Age Discrimination FEHA Claim

Olivares has not presented any direct evidence of age discrimination. Accordingly, to prevail, he must satisfy the McDonnell-Douglas three-step burden-shifting scheme for discrimination claims based on disparate treatment. Guz v. Bechtel Nat., Inc., 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352 (2000). Under this burden-shifting scheme,

> a plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie case*, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996) (emphasis in original). The court finds that Olivares fails to establish a prima facie case of age discrimination, let

5

alone rebut or overcome the legitimate, nondiscriminatory reason Canteen has put forward.

### 1. Prima Facie Case

Although the specific elements of a prima facie case may vary depending on the particular facts of the case, generally, the plaintiff must provide evidence that "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action . . ., and (4) some other circumstance suggests discriminatory motive." Guz, 24 Cal.4th at 355. Olivares has failed to establish the final element of his prima facie case.

Olivares argues that this element is satisfied because he was replaced by an individual under 40. (Opp'n at 7.) Normally, such evidence is sufficient to satisfy this element of the prima facie case. See Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981). However, Canteen has presented undisputed evidence showing it was required to, and did, put Olivares's position up for bid with the Teamsters Union, and that it was obligated to accept the highest bidder. It was only after none of the existing employees bid on the position that Canteen was able to hire from outside the union. This evidence negates Olivares's contention that his replacement is "some other circumstance suggest[ing] discriminatory motive." In light of the lack of any other evidence suggesting age discrimination, Olivares has failed

to establish a prima facie case.[6]

## 2. Evidence of Pretext or Discriminatory Intent

Even if Olivares's evidence is sufficient to satisfy his prima facie burden, Olivares has failed to rebut or overcome Canteen's proffered, nondiscriminatory reason for firing him. Canteen asserts it fired Olivares because it believed he had stolen money. (Mot. at 7.) Accordingly, to avoid summary judgment and satisfy his burden at this stage of the burden-shifting scheme, Olivares must "show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002). Where a plaintiff is relying solely upon indirect or circumstantial evidence of pretext, such evidence must be "specific" and "substantial" to survive summary judgment. Id. (citing Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998)).

Evidence that a defendant's articulated reasons for an adverse action were "objectively false" or that the employer made a mistake does not constitute evidence of pretext. Id. at 1063.

---

[6] Olivares also makes passing reference to an allegation that, at some earlier point in his tenure with Canteen, he was passed over for promotion by a younger man. (Opp'n at 7.) However, he has provided almost no information regarding this allegation, such as, when it happened, what happened, whether he was qualified for the position, and whether he was more qualified than the individual who got the position. This conclusory statement cannot support his prima facie burden.

7

Rather, courts "only require that an employer honestly believed its reasons for its actions, even if the reason is 'foolish or trivial or even baseless.'"  Id. (citing Johnson v. Nordstrom, Inc., 260 F.3d 727, 733 (7th Cir. 2001)) (holding it was unavailing for plaintiff to show that her employer's stated reason for firing her was objectively false because she presented no evidence suggesting that her employer did not honestly believe its proffered reasons).

    Here, Olivares has presented no evidence suggesting that Canteen did not believe he engaged in theft.  Rather, a significant portion of his evidence focuses on whether he actually stole the money.  He asserts that the shortages occurred, not because of theft, but because he took bills from his collection bag to replenish his "change bank."  (Pl.'s Ex. 10 at 45.)  As an initial matter, this theory is not plausible, given Williamson's declaration that he specifically controlled for this possibility.  Even if this theory were plausible, it does not call into question Nall's assertion that he believed Olivares was stealing.

    Similarly, Olivares argues that Canteen incorrectly asserts that his route was showing a high shortage rate.  (Opp'n at 4.) Canteen was mistaken, he asserts, as to which route he was working during that time period.  (Id.)  However, Olivares has offered no evidence contradicting Canteen's assertion that he was working Route 44 during the relevant four-week period.  Moreover, Canteen did not rely solely on the shortages rate reported on

Olivares's route, but also conducted an investigation to corroborate its suspicions.  Finally, even if Canteen had looked at the figures for the wrong route, this would only show that Canteen may have been mistaken in believing that Olivares had stolen; it does not call into question whether Nall actually believed that Olivares had been stealing.

Olivares's other arguments are equally unavailing.  First, he challenges the thoroughness of Canteen's investigation, claiming that Canteen's record-keeping is an "accounting nightmare" and that it is not possible to know if any shortages were truly the result of theft.  (Opp'n at 7.)  While the thoroughness of an investigation can be relevant to determining whether an employer's proffered nondiscriminatory reason is pretextual, the record here shows that Canteen conducted a thorough investigation.  It even went so far as to implement a "sting" operation to confirm whether the shortages were the result of theft.  At best, Olivares's evidence raises questions about the accuracy of the investigation's outcome, but does not suggest that Canteen's proffered reason was pretextual.

Second, Olivares argues that Canteen's nondiscriminatory reason is not plausible because all route drivers are over or short by some amount.  (Id.)  His evidence, however, shows at most that a significant portion of routes report minimal shortages or overages.  (Pl.'s Ex. 3.)  The evidence does not contradict Canteen's assertion that the shortage rate on Olivares's route was abnormally high and suggestive of theft.

9

Moreover, Canteen did not rely solely on the shortages rate on Olivares's route as a basis for its termination of Olivares.

In short, Olivares presents no evidence calling into question Canteen's assertion that Olivares was fired because Nall thought he was stealing. Rather, the evidence suggests just the contrary. In fact, in his deposition, Olivares admitted that he believes he was fired because Nall thought that he was stealing. (Cohen Decl. Ex. A. at 58.) The court GRANTS summary judgment in favor of Canteen on the age discrimination claim.

B.  Tortious Termination in Violation of Public Policy Claim

Olivares's tortious termination in violation of public policy claim is premised on his age discrimination claim. (Compl. ¶ 14-19.) Accordingly, the court GRANTS Canteen's motion for summary judgment on this claim as well.

C.  Breach of the Covenant of Good Faith and Fair Dealing

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive *benefits of the agreement actually made*." Guz, 24 Cal.4th at 349 (emphasis in original). The termination of an at-will employee without good cause cannot support a claim for breach of the implied covenant. Id. at 350.

Summary judgment is appropriate on this claim for several reasons. As an initial matter, Olivares fails to establish the existence of any contract, either express or implied, that can serve as the basis of this claim. Olivares argues that his

10

employment was subject to a collective bargaining agreement that provided he could only be fired for cause. (Opp'n at 2.) However, to the extent a collective bargaining agreement controls Olivares's employment, this state-law claim is preempted by § 301 of the Labor Management Relations Act ("section 301"), 29 U.S.C. § 185.[7] See Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993, 997 (9th Cir. 1987) ("The preemptive force of section 301 is so powerful as to displace entirely any state claim based on a collective bargaining agreement, and any state claim whose outcome depends on analysis of the terms of the agreement.")

Absent reference to the collective bargaining agreement, Olivares has not alleged sufficient facts to establish the existence of an implied contractual term limiting Canteen's ability to terminate him. Olivares asserts that such an implied contract exists based on: (1) a statement in Canteen's employee handbook that employees could not be fired for shortages "unless clear proof of negligence is shown;" and (2) his 33 years of employment with Canteen. (Opp'n at 2.) Neither argument is convincing.

First, the Canteen policy Olivares identifies comes from an outdated and superseded version of Canteen's employee handbook. (Reply at 9.) The handbook in effect during the relevant time period does not contain the provision relied on by Olivares.

---

[7] Olivares did not allege a federal claim under section 301 in his complaint; in fact, he made no mention of the collective bargaining agreement. Accordingly, he cannot raise this claim for the first time at the summary judgment stage. Gilmour v. Gates, McDonald, and Co., 382 F.3d 1312, 1315 (11th Cir. 2004).

11

Instead, it contains a cash-handling policy stating that employees may be "immediately terminated (and possibly prosecuted) for, among other reasons, . . . taking money from the cash register, money bags or petty cash fund." (Supp. Carroll Decl. Ex. A at 21.)  This language does not create an implied contract limiting Canteen's right to terminate Olivares.[8]

Second, although long and successful service may be relevant to the existence of an implied contract, "an employee's mere passage of time in the employer's service, even where marked with tangible indicia that the employer approves of the employee's work, cannot alone form an implied-in-fact contract that the employee is no longer at will." Guz, 24 Cal. 4th at 341-42. Finally, Olivares himself admitted in his deposition that he believed he could be fired by Canteen at any time for any reason. (Cohen Decl. Ex. A. at 93.)  For the above reasons, Olivares has not established the existence of a contract, express or implied, that could support a claim for breach of the covenant of good faith and fair dealing.

Even if Olivares had established that he could only be fired "for cause," he has not created a factual dispute as to whether

---

[8] Even if the handbook relied on by Olivares had not been superseded, Olivares mischaracterizes Canteen's old rules. The provision Olivares identifies actually stated that "employees shall not be charged for loss or shortages unless clear proof of negligence is shown."  (Pl.'s Ex. 2.)  This provision had nothing to do with discharge.  Instead, discharge was explicitly addressed separately: "Employees who are unable to account for the employer's money, equipment or merchandise, may be considered as unable to perform their job and may be subject to disciplinary action, including discharge."  (Id.)

12

1  Canteen breached this requirement.  "[I]f an implied contract
2  exists, employers who fire employees for misconduct are not
3  required to prove that the alleged misconduct actually occurred."
4  Silva v. Lucky Stores, Inc., 65 Cal.App.4th 256, 262, 76
5  Cal.Rptr. 382 (1998).  Rather, courts only consider "whether the
6  factual basis on which the employer concluded a dischargeable act
7  had been committed was reached honestly, after an appropriate
8  investigation and for reasons that were not arbitrary or
9  pretextual."  Id.  Under this standard, only three determinations
10 are relevant to the question of employer liability: "(1) did the
11 employer act with good faith in making the decision to terminate;
12 (2) did the decision follow an investigation that was appropriate
13 under the circumstances; and (3) did the employer have reasonable
14 grounds for believing the employee engaged in the misconduct."
15 Id. at 264 (citing Cotran v. Rollins Hudig Hall Int'l., Inc., 17
16 Cal.4th 93, 109, 69 Cal.Rptr.2d 900 (1998)).

17      Olivares has not created a factual dispute on any of these
18 questions.  Olivares fails to raise an issue of bad faith
19 because, as described above, he has not called into question
20 Canteen's assertion that it fired him because it thought he was
21 stealing.  Likewise, again for the reasons described above,
22 Olivares has not created a triable issue regarding the
23 reasonableness of Canteen's grounds for believing that Olivares
24 had stolen money.

25      Finally, Olivares has not created a triable issue regarding
26 whether there was an appropriate investigation.  Olivares

contends the investigation was inappropriate because neither Williamson nor Coates had any prior training on how to undertake an audit. (Opp'n at 4.) He also claims the investigation was faulty because neither of them counted or verified the allegedly missing money after it was turned in to the vault. (Id.)

Neither of these assertions is convincing. Although Williamson and Coates did not count the money once it was deposited in the vault, the money was counted by the vault cashier. Olivares has not provided any evidence challenging the cashier's counting procedures. Likewise, although neither Williamson nor Coates had any prior training on how to conduct an audit/investigation, the investigation they conducted was objectively reasonable and sufficient.

Olivares also contends that the investigation was insufficient because Nall never gave Olivares a sufficient chance to rebut the allegations. (Id.) However, the evidence shows that Olivares was given a fair opportunity to provide an explanation. Nall informed him that two supervisors had conducted an audit of four of the machines he serviced and that the results of the investigation showed the collection bags Olivares turned in were missing $40.[9] Olivares was given a chance

---

[9] Olivares contends that Nall did not provide any details of the investigation at the meeting. (Opp'n at 4.) However, Olivares's deposition testimony reveals that Nall at least told him how much money he was accused of stealing. (Pl.'s Ex. 10 at 35.) His deposition testimony also suggests he was told other information, such as the route the audited machines were on, though his deposition testimony is ambiguous on this point. (Id. at 36.) The court will treat this fact as disputed.

14

to respond to these accusations, but did not do so.  Even though Olivares alleges he was never told the date and route the investigation was conducted on, he was not prevented from asking for that information at the meeting.[10]

For all of the above reasons, the court GRANTS Canteen's motion for summary judgment on this claim.

### III.

The court GRANTS Canteen's motion for summary judgment on all of Olivares's claims.  The clerk shall enter judgment.

IT IS SO ORDERED.

Dated: 6/21/2005

                                                          /s/ David F. Levi
DAVID F. LEVI
United States District Judge

---

[10] Olivares presents three other arguments regarding the adequacy of the investigation, all of which are equally unavailing.  First, Olivares contends that the "over and short" document Canteen submitted is fabricated. (Opp'n at 4.) Specifically, Olivares contends that Canteen produced a report dated February 8, 2005 that altered the shortage figures for a certain route. (Id.)  Second, Olivares argues that Canteen's reliance on prior warning letters regarding shortages from 1995, 1996, and 2001 was improper and violates the collective bargaining agreement. (Id. at 5.)  Finally, Olivares contends that the investigation was inadequate because Canteen violated the collective bargaining agreement by failing to proceed with Union grievance process. (Id. at 6.)   However, Olivares has presented no credible evidence showing that the document was altered or fabricated. Additionally, Canteen did not fire Olivares based upon the old warnings.  Finally, to the extent Olivares seeks to allege a breach of the collective bargaining agreement, this claim is preempted by federal law.

15